Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

ASSOCIATED MUSICIANS OF GREATER NEW YORK, LOCAL 802, AFM-AFL-CIO, Respondent.

No. 68 Civ. 788.

United States District Court
S. D. New York.

April 8, 1968.

Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Julius G. Serot, Asst. General Counsel, Sidney Danielson, Regional Attorney, Region 2 N. L. R. B., for petitioner; Edwin H. Bennett, of counsel.

Ashe & Rifkin, New York City, for respondent; Eugene Victor, New York City, of counsel.

OPINION

HERLANDS, District Judge:

This petition for a preliminary injunction pursuant to Section 10(*l*) of the National Labor Relations Act, 29 U.S.C.A. Section 160(*l*) presents the question whether there is reasonable cause to believe that the respondent-labor union has engaged in, and is engaging in, "unfair labor practices", as that term is defined in the National Labor Relations Act.

The Court grants the petition. The findings of fact and the conclusions of law which constitute the grounds of the Court's action (Fed.R.Civ.P. 52(a)) and the reasons for the issuance of the preliminary injunction (Fed.R.Civ.P. 65(d)) are set forth in this opinion.

The Regional Director of the Second Region of the National Labor Relations Board (herein called the Board), acting pursuant to Section 10(*l*) of the National Labor Relations Act, 29 U.S.C.A. Section 160(*l*) (herein called the Act), has filed a petition for a temporary injunction pending the final adjudication of the Board with respect to the matters involved herein now before the Board on a charge filed by the National Association of Orchestra Leaders (Exh. 1 attached to the petition). The charge is that respondent, Associated Musicians of Greater New York, Local 802, AFM-AFL-CIO (herein called the union) has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(b) (4) (i) and (ii) (A), of the Act, 29 U.S.C.A. Section 158 (b) (4) (i) and (ii) (A), which prohibits certain conduct by a labor organization

to force or require an employer to join any labor organization.

The above-cited statutory provision contained in Section 8 of the Act relevantly defines "unfair labor practice" in the following terms:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \* \*

(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;

\* \* \* \* \* \* ."

At the center of the controversy is an orchestra leader named Joseph Carroll, who does business as Joe Carroll Orchestras. The union and Carroll have been litigating with each other for the past seven years. The present proceeding is another battle in that war.

The petition (dated February 26, 1968) is predicated on petitioner's conclusion that there is reasonable cause to believe that the union has engaged in the unfair labor practices charged and that a complaint of the Board based on the charge should issue.

The hearing on the petition was brought on by an order to show cause (filed March 1, 1968) returnable on March 5, 1968. Upon counsel's request, the Court set the matter down for an evidential hearing. A hearing was held on March 8, 1968. The transcript of that hearing runs to 242 pages.[1]

FINDINGS OF FACT

1. Petitioner is Regional Director of the Second Region of the Board, an agency of the United States. He has filed the petition herein for and on behalf of the Board.

2. On January 3, 1968, the National Association of Orchestra Leaders, pursuant to provisions of the Act, filed a charge with the Board alleging, *inter alia*, that respondent, a labor organization, has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(b) (4) (i) and (ii) (A) of the Act.

3. The aforesaid charge was referred to petitioner as Regional Director of the Second Region of the Board.

4. There is, and petitioner has reasonable cause to believe that:

(a) Respondent, an unincorporated association, is an organization in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

(b) Respondent maintains its principal office in New York City. At all times material herein, respondent has been engaged within this judicial district in transacting business and in promoting and protecting the interests of its employee members.

(c) Joseph Carroll is an individual proprietor doing business under the

---

1. Page citations in this opinion ("Tr. ——") refer to the transcript of this hearing. Joseph Carroll and Charles Peterson testified in behalf of petitioner. In behalf of respondent the following witnesses testified: Max L. Arons (president of Local 802); Frank W. LiVolsi

(president of Local 626 and chairman of the international legislative committee of the American Federation of Musicians); and Louis (Russ) Russo (general organizer and member of the trial board of Local 802).

trade name and style of "Joe Carroll Orchestras". He maintains his office and principal place of business in New York City. Carroll is engaged in the business of providing orchestras, bands, musical entertainment and related services to night clubs, country clubs, restaurants, hotels and other business and commercial enterprises and to private individuals. During the year 1967, Carroll had gross revenue from single engagements in excess of $200,000, of which more than $30,000 was derived from engagements performed within the State of New York for business and commercial clients engaged in interstate commerce. Excess of $50,000 was derived by Carroll from engagements performed outside the State of New York.

(d) Carroll is the sole owner and operational head of Joe Carroll Orchestras. He actively controls the formulation and implementation of decisions and policy with respect to fiscal and all other business matters as well as labor relations of Joe Carroll Orchestras. In addition, he acts on many occasions, as the orchestra or band leader of orchestras and bands furnished by him in the course of his business operations.

It is undisputed in this case that Carroll is an employer.

(e) Carroll employs over 200 musicians a year. For more than twenty years, all of the musicians employed by him have been members of respondent except for a few who were expelled from respondent because they played in bands which were conducted by Carroll.

(f) At all times material herein, respondent has had in effect a by-law prohibiting its members from performing in or with a band or orchestra which is led or conducted by a non-member of respondent, or in which a non-member of respondent plays an instrument or performs any other work of a musician, irrespective of whether such non-member is the employer of the musicians in the band or orchestra.

Said by-law provides as follows:

"ARTICLE IV.

Duties of Members and Penalties

Section 1. It shall be a violation and detrimental to the welfare of this local for a member to commit any one or more of the following acts, all of which are hereby prohibited, viz.:

\*  \*  \*  \*  \*  \*

(H) To perform in or with a band or orchestra which is led or conducted by a non-member of the Union or in which a non-member plays an instrument or performs any other work of a musician."

During all times material herein, except for the few occasions referred to below in subparagraph "(h)", respondent has enforced the above by-law.

(g) At all times material herein, respondent has regularly displayed in its official monthly publication called ALLEGRO which is distributed to its membership, a notice to the effect that Carroll is not a member of respondent and that members may not play in any orchestra conducted by him or in which he performs.

This notice reads as follows (Tr. 96):

*"Expelled member* Joseph (Joe) Carroll (drums). Members may not play in orchestras conducted by him or in orchestras in which he performs."

Article IV, Sec. 6 of respondent's constitution and by-laws [Petitioner's Exh. 3] provides that notices in the official Journal ("ALLEGRO") are legal notices to all members "and no further notice need be given to any member of the contents of such Journal".

Articles II, V and IX of respondent's constitution and by-laws set up the machinery to enforce compliance with the by-laws.

(h) At all times material herein, except for the few occasions referred to in this subparagraph, respondent has opposed any performance by its members in or with any band or orchestra furnished by Carroll, when such band or orchestra is led or conducted by Carroll, sole-

ly because Carroll is not a member of respondent. On a few occasions and as a matter of temporary grace dispensed by respondent, respondent suspended the enforcement of the by-law quoted in subparagraph "(f)" above.[2]

(i) About 2% of respondent's approximately 30,000 members are full time band leaders. It is respondent's policy to require membership of any person seeking to act as a band leader or conductor irrespective of whether such person is the employer of the musicians performing in the band or orchestra.

(j) Carroll is not a member of respondent. Carroll was expelled from membership in respondent in 1961 for alleged non-compliance with union regulations prescribing the payment of a certain scale of wages to respondent's member-musicians employed by him and the payment of hospitalization benefits. Thereafter, Carroll applied for reinstatement in 1965. His said application was denied by respondent's parent body, the American Federation of Musicians, sometime in July, 1967.

(k) At no time since said rejection in July, 1967 has Carroll filed any new application for reinstatement as a member of respondent; nor has he at any time since said date informed respondent that he was willingly and voluntarily seeking membership in respondent.

(l) In about August 20, November 1 and November 8, 1967 and again on January 10 and 11, 1968, respondent, by its officers and agents, told Carroll, in substance, that respondent wanted him to file a new application for membership in respondent; that such application would be recommended by respondent for approval by respondent's parent body, the American Federation of Mu-

sicians. On about August 20, 1967, respondent conditioned Carroll's rejoining upon payment by him of money that respondent claimed was owing by Carroll for his alleged prior failure to pay the scale of wages and hospitalization benefits as described above in subparagraph (j).

(m) Respondent has induced and encouraged individuals employed by Carroll to engage in strikes and refusals in the course of their employment to perform services, and has threatened, coerced and restrained Carroll; and an object of the aforesaid acts and conduct of respondent has been and is to force and require Carroll to join respondent.

5. It is a reasonable probability and is fairly to be anticipated that, unless enjoined, respondent will continue and repeat and threaten to continue and repeat the acts and conduct hereinabove set forth and substantially similar acts and conduct.

## Discussion

### A. Petitioner's Position

Petitioner has placed major reliance upon the operation and enforcement of respondent's by-law [quoted in Finding of Fact 4(f)] and respondent's notice in Allegro [quoted in Finding of Fact 4(g)],—treating the promulgation, operation and enforcement of the by-law and the Allegro notice as conduct on respondent's part (Tr. 218–219). Petitioner's position is that the combined dual effect of the promulgation, operation and enforcement of the by-law and notice is inexorably, first, to induce and encourage Carroll's employees to refuse to perform any services for him [3] and, secondly, to threaten and coerce Carroll himself,—and that in both such cases

2. Respondent's attorney, in his concluding argument, alluded to the fact that "Carroll is playing and has been playing for the last few months without the imposition of his not being in the union, and I am sure that the union will continue to desist in enforcing these bylaws until we have had a final determination of this Act" (Tr. 234). However, in replying to

the Court's inquiry, respondent's attorney was not willing to stipulate to suspend the enforcement of the by-laws pending the final outcome of the case. (Tr. 234).

3. Respondent's attorney concedes that respondent has "expelled members for playing *with* Carroll". (Tr. 222) (Emphasis supplied.)

"an object" of respondent's conduct is to force and require Carroll to become a member of respondent, regardless of the fact that Carroll himself is an employer.

To the foregoing, petitioner couples the evidence of respondent's established and continuing policy to require union membership of all orchestra leaders regardless of the circumstance that such leaders may be employers (Tr. 220). Conjoined with the foregoing is the evidence of respondent's active enforcement of its by-laws by the bringing of charges, whenever respondent chooses to do so, and by the overhanging, continuous threat to bring such charges against those musicians who play under Carroll's conductorship.

The inference stressed by petitioner is that which flows from respondent's by-law, the Allegro notice, and respondent's established policy,—an inference (fortified and corroborated by the testimony of Carroll and Peterson concerning conversations with respondent's representatives) that respondent wants Carroll back in the union and that an object of respondent's conduct was and is to force and require Carroll to rejoin respondent. Petitioner claims that the evidence of the conversations between Carroll and Peterson and respondent's representatives—viewed in the context of the said by-law, the Allegro notice, and respondent's policy—constitute a more than ample basis and reasonable cause for petitioner to believe that respondent has violated the Act.

Petitioner emphasizes that such basis and cause exist "even apart from the credibility question" (Tr. 221) raised by the conflicting testimony as to what was actually said in the conversations between Carroll and respondent's representatives.

### B. Respondent's Position

Respondent seeks to attenuate the force and significance of its by-laws, its Allegro notice, and its declared policy —the existence and enforcement of which respondent admits (Tr. 222)— by arguing that the evidence establishes the following facts:

(1) During the past seven years, in and outside the courts, Carroll (in the words of respondent's attorney) has waged a "seven-year fight" and has used "every single device available under the law to get to be a member of this union" (Tr. 9–10) ;

(2) By the "twisting of conversations" and the setting forth of facts that "are a fabrication", petitioner "is trying to convert a fact situation" and "to manufacture a set of facts" in order to create the false impression that respondent was attempting to coerce Carroll into becoming a member of respondent (Tr. 10, 223) ;

(3) Because there is a "question of credibility" (Tr. 6–7) posed by the face-to-face conversations and telephone calls between Carroll and respondent's representatives, " * * * the sole issue that calls for the immediacy of this drastic action is the effect of the conversations, the truth of the conversations, and the objective of the conversations" (Tr. 14) ;

(4) " * * * the very nub of this case" is that respondent does not want Carroll as a member (Tr. 234) ;

(5) Respondent concedes not only the existence of the by-laws cited by petitioner but also that respondent enforces and acts under those by-laws (Tr. 222, 236). Respondent likewise concedes the Allegro notice (Tr. 225). However, as to the Allegro notice, respondent argues that the Allegro notice should be interpreted not according to its wording but according to "the way it has been enforced" (Tr. pp. 229, 230) ; that the Allegro notice and the by-laws do not constitute a directive to respondent's members not to play in Carroll's orchestras (Tr. 228) ; that the Allegro notice and the by-laws should be interpreted as constituting respondent's prohibition against its members playing in an orchestra conducted by Carroll, having as its objective discouraging or stopping of its members from working

"with" Carroll but not working "for" Carroll. The "distinction" drawn by respondent between playing "with" Carroll and playing "for" Carroll is motivated, according to respondent, solely by its objective of restraining its members from playing *with* a non-union member (Tr. 223–227). In respondent's view, when Carroll conducts he is "an instrumentalist, just like a side man" (Tr. 225). So far as respondent is concerned, "we [respondent] don't care what he [Carroll's being an employer] is" and "It makes no difference at all" whether or not Carroll is an employer (Tr. 225–226) because respondent has the right to stop its members from working *with* any non-union musicians including orchestra conductors or leaders (Tr. 224, 226–228, 238). Having said this, respondent's position is: "We are not stopping our members working *for* him _ _ _". (Tr. 227) (Emphasis added.) [4]

### C. The Court's Views

The Court rejects respondent's contentions and adopts petitioner's position as consonant with the facts established by the fair preponderance of the credible evidence and the legal effect of that evidence.

"An object"—though not necessarily the only object—of respondent's conduct is to pressure Carroll into rejoining respondent on terms agreeable to it. The technique used to accomplish that objective is to induce and encourage respondent's members not to play in any of Carroll's orchestras when he conducts.

Respondent's argument based upon the grammatical difference between the prepositions "for" and "with" (in the expressions "play for" and "play with") is a dialectic having no correspondence in reality. Regardless of the preposition, respondent induces and encourages its members not to play in a Carroll orchestra when he conducts; the physical fact of nonplaying is unaffected by

the semantics of respondent's argument; and, likewise, one of the objects of respondent's conduct—to coerce Carroll by economic pressure to rejoin respondent— is unaffected by respondent's verbalisms.

Whatever the suspension last year on a few exceptional occasions of respondent's enforcement of its by-laws, the Allegro notice and its policy with respect to Carroll (Tr. 70, 79, 91–92, 97–98, 159, 171, 181), it was expressly understood that it did not set any precedent (Tr. 86) and that it was only a temporary lull aimed at creating a climate conducive to exploratory settlement negotiations. The elemental fact is that at no time has respondent repealed the by-law affecting Carroll or withdrawn the Allegro notice that specifically names Carroll (Tr. 95–96). Respondent has declined to stipulate that it would suspend the operation of the by-law and notice pending the determination of proceedings involved herein. A truce resting on no firmer foundation than respondent's reservation of absolute power is only a transient expedient effecting no material change in the basic relationship between the parties.

### D. Consideration of the Testimony

Respondent's president, Max L. Arons, testified that it is respondent's "policy to unionize all people who * * * conduct" (Tr. 168, 180); that it is respondent's policy not to permit a non-union musician to conduct even when the members of the orchestra belong to respondent (Tr. 170); and that any member of respondent who played in an orchestra led by Carroll "would be subject to charges". (Tr. 170).

Distinguishing between the "object" of the respondent's by-law and its "effect", Arons claimed that it was respondent's sole purpose or object in carrying out its by-law and policy to create openings for conductors who are members of respondent and that it was not respond-

---

4. Despite the above distinction urged by respondent's attorney between "for" and "with", he inconsistently declared: "They [respondent's members] may not work *for* him." (Tr. 229) (Emphasis supplied.)

ent's purpose or object to get Carroll to join respondent (Tr. 175–177).

Respondent must be taken to have intended the accomplishment of the obvious, immediate and direct effect of its conduct. This obvious, immediate and direct object and its obvious, immediate and direct intended effect are equatable in a causal relationship. That intended object and effect are to bring coercive pressure on Carroll in order to make him rejoin respondent on terms acceptable to it. Respondent's ultimate objective and broader purpose is to unionize all orchestra leaders in order that only union members will fill the jobs of leading orchestras. The immediate object and effect vis-à-vis Carroll is one step toward the achievement of the ultimate objective and broader purpose vis-à-vis all orchestra leaders.

The conflicting testimony about the conversations between Carroll and respondent's representatives poses a question of credibility that the Court resolves in favor of Carroll and his corroborating witness Charles Peterson.

During the period from about August 20, 1967 to January 11, 1968, Carroll had at least five face-to-face meetings with respondent's representatives and several telephone conversations. The meetings took place on or about August 20, 1967, November 1, 1967, November 8, 1967, January 10, 1968 and January 11, 1968.

At the meeting of August 20, 1967, according to Carroll, respondent's president (Max L. Arons) told him that the International Union, American Federation of Musicians had not yet acted on the matter of Carroll's reinstatement (Tr. 58); and Arons asked him whether he would be willing to pay certain back wage differentials allegedly owing for a period in 1960 and 1961 (Tr. 60). Carroll refused to pay the claimed back wages (Tr. 61–62). Although Carroll did not know it at the time, his application for reinstatement (filed in the fall of 1965) had been denied sometime in July, 1967 (Tr. 50–52).

According to Arons, it was Carroll who had initiated the meeting of August 20, 1967 (Tr. 145, 146); that it was Carroll who asked, "How do I get back into the union?" (Tr. 148); and that, when Carroll said that he would pay up the back wages, Arons agreed to undertake to get Carroll back into the union (Tr. 149). Frank W. LiVolsi, another union official, testified that Arons said that if Carroll "paid whatever he owed to the union" (Tr. 197), he "would be restored to membership" (Tr. 197, 200); and that Carroll replied, "What do I owe? And get back to me and maybe we can get together." (Tr. 200).

On the evening of November 1, 1967, at the Americana Hotel, according to Carroll, Louis Russo, one of respondent's officials, twice told him, " * * * we want you back in the union." (Tr. 73). Charles Peterson, an officer of the National Association of Orchestra Leaders (Tr. 109–110), corroborated Carroll (Tr. 112, 114, 124).

Carroll also testified that, prior to these conversations on November 1st, Carroll had twice telephoned one Badale, an officer of respondent, and had told him that he was willing to pay up the back wages (Tr. 63, 64).

Louis Russo contradicted Carroll. He testified that, on November 1st, it was Carroll who told him, "I want to join your union. I want to get back to your union." (Tr. 204, 205, 213–214).

On November 8, 1967, Carroll, Peterson, Russo and Arons had a meeting at Aron's office (Tr. 80). This meeting had been preceded by a telephone call on November 2nd from Russo to Carroll, wherein (according to Carroll) Russo asked him, "Will you come up here this morning to process that reinstatement application * * *?" (Tr. 77). Carroll did not appear at the union office (Tr. 77). Instead, on November 3rd, Carroll had a messenger pick up an application blank there (Tr. 80–81).

At the November 8th meeting, Carroll told the respondent's representatives

that he would not sign the application blank (Tr. 85). According to Arons, he told Carroll at this meeting that he would try to get Carroll back into the union and that, pending such action, he would allow Carroll to continue to play as if he were a union member (Tr. 159).

On January 10, 1968, according to Carroll, at the NLRB trial examiner's hearing room, Arons told Carroll that he had the matter of Carroll's "reinstatement all straightened out" and that, if Carroll signed the application for reinstatement, it would be sent to the Federation with respondent's approval and that then Carroll could withdraw the pending unfair labor practice charge against respondent (Tr. 100–101). According to Arons, on this occasion, he told Carroll that respondent was going to approve his application whereupon Carroll said that the pending charge could always be withdrawn (Tr. 161).

On January 11, 1968, according to Carroll, he had his last conversation about reinstatement (Tr. 106) with respondent's representatives. This also occurred at the NLRB trial examiner's hearing room. Carroll testified that, at that time, Arons told him that he wanted Carroll to join the union by paying the union wages, just as another leader (one Cutler) had done. (Tr. 103, 106). Both Arons and Russo testified that it was Carroll who had taken the initiative in the moves to get back into respondent (Tr. 138, 140, 163, 172, 209–211, 213–214); and that, in fact, respondent does not want Carroll as a member (Tr. 171–172).

To extract the full significance and flavor of these conversations, they must be interpreted in the context of the omnipresent by-law [Art. IV(H)], the continuously published Allegro notice, and the standing policy of respondent. It is the Court's finding that the fair preponderance of the credible evidence es-tablishes that it was respondent that sought to induce Carroll to rejoin it on terms and conditions acceptable to it.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter of this proceeding.[5] Under Section 10(*l*) of the National Labor Relations Act, this Court is empowered to grant injunctive relief.

2. Petitioner has shown sufficient ground for the issuance of an injunction under Section 10(*l*) of the Act.

3. There is, and petitioner has, reasonable cause to believe that:

(a) Respondent is a labor organization within the meaning of Sections 2(5), 8(b) and 10(*l*) of the Act.

(b) Joseph Carroll, doing business as Joe Carroll Orchestras, is an employer engaged in interstate commerce and in an industry affecting commerce within the meaning of Section 2(2), (6) and (7) of the Act. Joseph Carroll, has at all material times, been an employer and self-employed person within the meaning of Section 2(1) and Section 8(b) (4) (i) and (ii) (A) of the Act.

(c) Respondent has engaged in unfair labor practices within the meaning of Section 8(b) (4) (i) and (ii) (A) of the Act, affecting interstate commerce within the meaning of Section 2(6) and (7) of the Act; and a continuation of these practices by respondent will impair the policies of the act as set forth in Section 1(b) thereof.

4. To preserve the issue for orderly determination by the Board as provided in the Act, the Court concludes that it is appropriate, just and proper, and the Court hereby orders, that pending the final disposition of the matters herein involved now before the Board, respondent, its officers, representatives, agents, servants, employees, attorneys, and all members and persons acting in concert

5. For the purposes of this proceeding, respondent has not contested Carroll's standing as an employer engaged in interstate commerce or an industry affect-ing interstate commerce. The parties have stipulated to confer jurisdiction upon this Court for the purposes of hearing and determining this petition.

or participation with it or them, be and hereby are enjoined and restrained from the commission, continuation and repetition of the acts and conduct set forth in the above Findings of Fact 4(f), 4(g), 4(h), 4(i), 4(l) and 4(m), with respect to Joseph Carroll, and any other acts and conduct with respect to Joseph Carroll that are substantially the same as those set forth in said specified Findings of Fact.

Settle an order with all deliberate speed in accordance with the views expressed in this opinion and in accordance with the requirement of Fed.R. Civ.P. 65(d) that the restrained acts shall be described in reasonable detail, and not by reference to any other document.